My name is Carl Blackstone. I represent the United States in this appeal. And this is an appeal by the United States, in order of the District Court, suppressing three cardboard boxes containing marijuana, which were seized from a white Toyota truck on the night of the incident. This is a reasonable suspicion that this Toyota truck was involved in a drug transaction with a green Taurus automobile. So the issue is, was there reasonable suspicion with respect to this Toyota pickup, right? That's correct, Your Honor. The reasonable suspicion as to whether the stop of the Toyota and the Taurus was justified by reasonable suspicion. And the Ford? He stopped both vehicles. Well, who cares about the Ford? We care about the Ford. Is the Ford appealing? No, the Ford's not appealing. But you have to look at the activities of the Taurus in relation to the Toyota. The problem with the District Court's ruling here, which is subject to the noble review, is the District Court did not look at the totality of the circumstances. She says much in her order in which she said, I'm not going to focus on the activities of the Taurus. Well, just by focusing, you know, obviously, if you look at the test, it's the totality of the circumstances before the stop. Just give me a review of the facts relative from when, what the officer testified to as the Taurus, what the officer testified to in terms of his expertise as to what he thought was going on, up to the point that the Toyota becomes involved. Sure. I'll try to be brief. And so what was the, you know, but just so that we can, your best facts. Okay. The facts are this. There is a van left in a parking lot in Monroe, Washington. The van is rented by a man who was previously involved in a drug smuggling deal down in Los Angeles. He used a van in that transaction in which he removed the back seats. This man, Mr. Brandt, leaves another van in the parking lot. He goes into Fred Meyer and has an ice cream cone and a mask in his mouth. And this is the parking lot where the Toyota gets stopped later? No. Okay. So when you say parking lot, we need to know which parking lot. The man named Mr. Sturdivant comes and gets into the van and takes it into rural Snohomish County in which he loads the van with several cardboard boxes. He drives the van back to the Fred Meyer parking lot, gets out of the van and leaves the van. He is then seen getting into a green Ford Taurus which is driven by a woman named Bianca Bowler. At this point, the agents decide we're not going to really do much with the van. But they see Sturdivant and his girlfriend leaving the Taurus. They look in the back and they see the same type of cardboard boxes in the back of the Taurus that are also in the back of the van. Agent Pribble, who has 18 years of experience as a law enforcement agent, 15 with Customs, three with the New Mexico Police Department, says I think there's going to be a drug transaction going on. I think those boxes in the back of that Taurus are green exchange at a house or a vehicle. So Customs decides we better follow that Taurus. For 45 minutes they follow that green Taurus. It drives in a very circuitous, suspicious manner. It goes from Monroe eight miles over to the town of Snohomish and then it goes to the airport in Snohomish. It doesn't drive directly there. It goes up and down residential streets. What does the officer say about counter surveillance at that? Does he say about it that there's something in the record about counter surveillance moves? Two agents testify, Agent Pribble and Agent Fedovic, and they both say that these were engaged in something called a heat check. Essentially they were driving in and out of residential neighborhoods, not going the most direct route. Based on their experience, the driver of the Taurus was trying to evade or make sure they weren't being followed by law enforcement. So they eventually get to the airport, and then once at the airport, there's much more counter surveillance driving. They drive into a parking lot, stop there, drive back to another parking lot, go up and down the road, and then eventually they drive into the area and they stop by a grocery store and they park next to the utility room and they park again.  owner of the organic trees inked nursery. And just to set the scene, this is December 16 of 2003, seven o'clock at night. It's very dark in the northwest at that time. This area is rural. It's farmland. There's nobody out there. There's one home there and a bunch of businesses that were closed. Is that all on the record? It's all on the record, Your Honor. The tourist then drives into this parking lot and stops. Agent Pribble then drives by and can see the back of the tourist. And behind the back of the tourist, he sees several people meeting. That's his testimony. At that point, Agent Pribble, with his 18 years of experience, says, I think the exchange is taking place now. He decides, because of the lack of evidence, that Agent Pribble is not going to make an arrest. He's going to make a terry stop. He goes down the road, calls for backup, makes a U-turn, and then he pulls into the driving parking lot of big trees. As he does that, he sees the white Toyota, which is parked right next to the green tourist, backing out. I don't think the record doesn't show it's right next to the forest. His testimony is it's parked to the right of it. And if the court looks at it... No, it's to the right, but it didn't say how close. There are other cars there too, right? There are other cars there, but I think if you look at Exhibit 6, which is ER 220, you can see the Toyota is right next to the tourist there as it backs out. At what point? This is the point at which Agent Pribble stops it. The Toyota is backing out towards the driver's side of the tourist. If you look at Exhibit 6, I think it's ER 220, you can see in that parking lot that the Toyota was. But even if it wasn't right next to it, the Toyota was the only vehicle in that parking lot that was moving shortly after Agent Pribble saw what he thought was a meeting behind the tourist. He then pulls in. He sees the Toyota backing up. He blocks both vehicles. Agent Pribble gets out of his vehicle, and then he sees that the boxes in the back of the tourist are no longer there. They're in the back of the Toyota. And I submit at that point he had probable cause to arrest the people in the Toyota and that's why Agent Pribble and his team, the dog team alerts, and they go in and they find three boxes of marijuana. So I think in terms of the key facts for us, that's why you have to look at what the tourist is doing here. For 45 minutes this tourist is driving around in a very suspicious manner. Clearly they're trying to avoid the police and look for a place to meet. Then after 45 minutes of doing this, they pull into a parking lot, and this is the first time someone gets out of a vehicle. It's logical to assume from that there's going to be a meeting taking place. And then when Agent Pribble pulls into the parking lot, there's the Toyota backing out. It's a fair inference that the exchange is taking place, the Toyota now has what it wants, and it's moving on its way. Just so that I understand your argument, that you say that it's de novo review on the totality of the circumstances, and that the facts really aren't. Are there any factual findings that the district court made that we as an appellate court would be able to use to be stuck with, as it were? No, we don't disagree with her factual findings. We think she didn't make certain findings, but the facts are in the record. They're uncontroverted, so this court can rely on the testimony of Agent Pribble and the testimony of the other witnesses. But the facts found by Judge Peckman, we don't disagree with those facts. We just think she didn't look at all the facts. So her error was in how she defined the totality of the circumstances as opposed to how you're defining it? Her error was in saying these facts do not equal reasonable suspicion. It was a reasonable conclusion. One of the things you pointed out or you tried to emphasize was this whole notion that she didn't consider the van or the Taurus. Correct. But she made it pretty clear that after the officers observed the driving, that they had reasonable suspicion to stop those, to stop that  But it was clear in her mind. For me, it was clear, at least what I saw, was that the judge was clearly aware of the Taurus. Correct. And the activities of the Taurus, especially in light of the officer's testimony about Brant and Sturdivant and all that was going on. Correct. And so she had in her mind that the Taurus, at least this is what I read the record, that the Taurus was involved up to no good and the officers could have stopped the Taurus. But the problem was there was no connection between the Taurus and the Toyota. Well, I'll address both of those points. First of all, she did focus on the Taurus. She said there was a zone of suspicion around the Taurus. But in her legal conclusion, she says, I can't focus on the Taurus. I have to focus solely on what the Toyota did. And if all you have is two guys backing out of a parking lot at 7 o'clock at night, that ain't reasonable suspicion. But when you put them together, there is a connection between the Taurus and the Toyota. This is 7 o'clock at night. The business is closed. It's dark. There are two vehicles in a parking lot. There are people apparently meeting behind the Taurus. Wait a minute. There are only two vehicles in the parking lot? Two vehicles are occupied in the parking lot. There are six or seven other vehicles in the lot. But you only have one other vehicle moving, which is a Toyota. That vehicle is moving shortly after someone is seen behind the Taurus, which contains cardboard boxes of marijuana. Well, she drew the inference in that, I guess, that this was just one of the vehicles that was parked in the lot. It's one of the vehicles parked very next to the Taurus, and the only vehicle in the lot that's moving shortly after the agency of this meeting. I think this case is identical to your decision in Garcia Rodriguez. You have a truck go into a warehouse, and there are nine other cars that drive into that warehouse. The suspicion is the truck is involved in smuggling drugs or contraband from Mexico. This circuit said the police could have searched every single vehicle that came out of that warehouse. This parking lot is a functional equivalent of a warehouse. The Taurus drives into it. There's a zone of suspicion around it. I submit the agents could have searched any vehicle. Every vehicle they could have stopped. Every vehicle in that lot. That was occupied and moving. Suppose somebody came up and tried to get in one of the other vehicles. They could have probably asked them, who are you? They said, I work for Big Trees, and they let them go on their way. We're not talking about a full-blown arrest. We're talking about just reasonable suspicion. And the Supreme Court said, all you have to have is reasonable suspicion that criminal activity may be afoot. And I emphasize the word may. They don't have to know there's criminal activity going on. They don't have to have probable cause. Just may. And when you approach it commonsensically, I think it's clear there was reasonable suspicion here. Okay. Thank you. Good morning. May it please the Court. My name is Robert Goldsmith. I represent Judge Bigsby at counsel table as Alan Bentley. He represents Sam Status. We are co-counsel on this brief. We ask this Court to affirm Judge Peckman's decision. As the Court has already noted, reasonable suspicion is a fact-driven decision. And to begin with, the government's burden at the very hearing is preponderance of the evidence to support that there's reasonable suspicion. So they bear an initial burden because it's a warrantless search. I saw you sort of nodding your head when I was saying factual findings, which that's not really part of the evidence yet, but the or, well, it's never the evidence. But what you think that there's some factual findings here? There were significant factual. The government is making factual arguments that were not found by the Court. And I'm going to read you an important section of the Court's findings. Give me a page reference, will you? It's on her transcript. That's page four of her full findings. Okay. That's the top number, right? That's the top number. Yes. Go ahead. ER 232. Go ahead. I just have an excerpt. I don't have the full number. Go ahead. At the bottom of that page, it says, at about 7 p.m. in the dark, it's page six in the excerpt. At about 7 p.m. in the dark, the agent saw the tourist parked in a nursery parking lot with six or seven other vehicles. As he passed by the area of the parking lot, he observed two or more people standing in the lot near the tourist. The officer's testimony on how many people is vague. He was not able to identify conclusively how many he saw. He could not describe them or tell if they were even male or female. And that's important because we knew that there was a female in the tourist as they were surveilling it. His observation of the lot was brief, as he was attempting to appear to be a casual passerby. And I would add that, as she found earlier, he was driving by on a curving road at night, trying not to look like anybody but a casual passerby. So not slowing down or not taking his eyes off the road much. So with a very brief glance, that's all he saw. He did not even see the Toyota at that point. And the court explicitly did not find and agree with his inference that there was a meeting. There wasn't enough factual basis for the court to agree that there was a meeting because the term meeting implies – Well, did the court say, I don't believe you, that you saw that? The court didn't say, I don't believe you, but the court did say that he was vague about what he saw. That's what the court did find. And she has that in her findings. And that's significant because the government really harps on the fact that there was a meeting, but the court did not make that factual finding. And a meeting implies representatives of two different parties. What we have here are two people or more seen there. They could have been the two people from the tourist stretching their legs. The other thing the government does with the facts is argue additional facts that the court did not find. The court heard testimony that an hour after this particular stop, three or four people from Big Trees returned to that parking lot to retrieve their cars. So this was not an area that people were not coming to later on at night significantly. And the thing that distinguishes this case from the case the government relies on, I think, with Garcia-Rodriguez, are three important factors. One, this Court, as the first factor said, that was a border area search. That has never been an issue in this case. Neither the government nor the judge found this to be a border area search. Number two, in Garcia-Rodriguez, this Court said it was a high-crime area. Again, this Court explicitly found, Judge Peckman found, it was not a high-crime area. So already we have two major factors that don't exist here. The third factor is particular to the Toyota. In Garcia-Rodriguez, the officers were able to observe the cars come and go quickly. In other words, they'd come there for a few minutes, get loaded, and then leave. They never saw the Toyota come here. They have no idea. They have no idea whether the Toyota was there for five minutes or five hours, because they didn't see it until he returned to the lot. And then they see the brake lights of the Toyota on, attempting to leave. That's the only thing they saw about the Toyota. There is no connection before the stop to that between the Toyota and the Taurus. Go ahead. There's no connection before the stop, but the Toyota apparently is the closest vehicle to the Taurus, right? It's right next to the Taurus. The other cars may be around, but it's not right next to the Taurus, right? It was not seen parked next to the Taurus. It's already in motion when the officer sees it. There are other cars parked. There was testimony from one of the employees from Big Trees who came back that his truck was parked six or seven feet away. But the only people there during the time of the surveillance were people either from the Taurus or other people that, you know, maybe lead to that, you know, they couldn't identify. They were the only people, and it was apparent. It's a fair inference that there was some kind of exchange, right? The court specifically found that I didn't see. The officer didn't testify he saw any. No, he didn't see it. But I say it's a fair inference. It's a fair inference that there was some kind of exchange of some kind of, you know. Well, that was because I found that that inference was a hunch. Your Honor, that was her factual. So. So the question is, you know, why aren't those facts enough? I know the association with the Taurus. And I don't think anybody doubts that there is reasonable suspicion with respect to the Taurus. But the association with the Taurus, Taurus, you know the Taurus is a good reasonable suspicion. It's carrying drugs. And then there's some kind of transfer, and the Ford drives away. Isn't that enough reasonable suspicion? Well, there was no evidence of a transfer, Your Honor. The key facts that the court focused on correctly in this case, because we need particular right suspicion as to the Toyota, were what did they see with respect to the Toyota? The only thing she saw, she found, and that's the only thing supported by the facts, is that the Toyota was leaving from a zone of suspicion. The officer did not see any exchange. He could not describe beyond people standing there what they were doing. Well, but the officer, regardless of whether, I mean, if she calls it, I mean, to me, when she says it's a hunch, to me that's illegal. I mean, that's a legal conclusion. That's not, you know, that's not a factual finding, because a hunch is, you can't stop someone on a hunch. You can stop someone on reasonable suspicion. But I guess there's all the activity that goes on before, but there is testimony in the record that something, there were people near the Taurus, then the only car moving when the officers come in is the Toyota. And why can't they stop, just say, okay, stop, let's see what's happening. And according to what the government said the evidence is, and if you want to differ on what the facts are, that that's when, after the officer said, okay, stop both cars, I'm checking out what's going on, I don't have enough people to continue to surveil both cars, then he noticed there were cardboard boxes in the Toyota. After the stop. That's right. So they're saying, so we're really talking about, no, there was a probable cause, but, you know, why can't they just, you know, I mean, they've watched this whole thing that, you know, someone that's involved in drugs, all this counter surveillance, you know, the boxes, it's in the parking lot, it's 7 o'clock at night, and that there's some, there's a meeting, be it vague or whatever, there are people behind, the only car that's moving is a Toyota, why can't they just stop? Then they noticed the boxes, then they got more. Well, we think that that's, in a sense, the kind of drag. Why isn't that just good police work? I mean. Well, Judge Peckman did say it was a good hunch that he had. And. Well, it turned out to be a correct hunch, I guess, or whatever materialized. But, yeah, that, yeah, I don't think that helps us resolving the legal issue. The factual, the amount of facts this Court is going to require to stop a particular individual is always the question before the court in reasonable suspicion. And if you say the government argument is that any car pulling out of that lot after you saw a couple of people standing there next to that suspicious car, that's enough. We take that decision and broaden it, and it really could have horrible dragnet-type approaches that this Court has condemned in Sigmund Ballesteros, which we have cited in the brief, which is to say that basically we're saying that the suspicion of the tourist rubs off automatically on anybody else near it, even though we have nothing we know nothing else about this Toyota or this person. Let's say it's on a street corner, and we've got people who, you know, are dealing drugs, and it's a high-crime area, but someone just walks. There's a meeting there. We don't see who's in the meeting. We don't see who's involved. And then someone's walking away from it a minute later after they've turned around and come back to the scene. This is what's happened here. That person can be stopped. That person can be accosted by an officer at gunpoint, because that's what they did on the Toyota. I don't think we want to go that far. Reasonable suspicion requires particularized facts as to the individual's stuff, not generalized facts to an area. And that's what the government's position really is. We're talking about an area dragnet here, because there was nothing else on the Toyota. If they've seen that Toyota in the lot with the lights on, waiting for that car, obviously then they've got a particular connection to it. But they don't have that fact. And it's a fact-driven decision. Judge Peckman hurled all the evidence, and her findings were correct. There was no clear error. That is what she reviewed her findings on, is clear error. The government disagrees with it, but that doesn't mean it's clear error. Reasonable people can differ on these things. And Judge Peckman, it's their burden, found that they hadn't sustained their burden in a warrantless search. Well, I guess on the ñ but, see, I guess I'm looking at it from the standpoint that it has to be what the totality of the circumstances are. I don't really see any ñ I don't see any factual disputes except the facts. And so, to me, I guess I'm looking at, under these facts, doing the totality of the circumstances analysis is, as a matter of law, is that sufficient to make that stop or not? So I don't ñ I'm not seeing the clear error. Well, the clear error standard is to the facts that she finds. And she didn't find that there was a meeting there, as the government has harped on. She didn't find that the Toyota was parked next to the Taurus, as the government harps on. Those were critical facts that she found that she disagreed with the government on. Well, there were people there. That's, to me, what the facts are. As we said, it was vague. They couldn't even identify the gender. So we don't know who the people were associated with. And we don't know how many people. And we couldn't tell what they were doing. So there's nothing particular about two people standing behind a car that I think particularizes suspicion as to a different vehicle pulling away. All right. I think I understand your argument. Thank you. Thank you. Thank you, counsel. We appreciate your argument. The matter will be submitted.
judges: Tashima, Paez, Callahan